[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is an action on a petition for a finding of neglect and an action petitioning the termination of the parental rights of the biological parents of Nicholas H. These actions have been brought by the Department of Children and Families ("DCF"). The actions have been tried together as coterminous petitions. General Statutes § 17a-112(e). CT Page 5172
The biological father of the child is David T., a resident of the State of Rhode Island. He was served with notice of the neglect proceedings and the petition of termination of his parental rights by certified mail. The court finds that he received actual notice of those proceedings and has failed to appear on any court dates. He was also served by publication in the Providence Journal. Further, DCF attempted to reach him by telephone but his number was unlisted. The DCF case worker has written to him with no response. On December 29, 1998, she stopped by his home and he was not home. She left him another copy of the petition for termination of parental rights with notice of the next court date. He never responded or appeared. The court finds that reasonable efforts have been made to contact the biological father. He is defaulted.
The biological mother has appeared and been represented by counsel throughout these proceedings. She has vigorously presented her position through cross-examination and presentation of her own witnesses. The minor child has been represented throughout these proceedings by counsel who has been an active participant.
The neglect petition was filed on October 9, 1997, claiming that Nicholas (1) is being denied proper care and attention, physically, educationally, emotional or morally; (2) is being permitted to live under conditions, circumstances or associations injurious to his well-being; or (3) has been abused and has physical injury or injuries inflicted by other than accidental means, or, injuries which are at variance with the history given of them.
The mother is Terrielynn H. The father is David T. The petition for termination of parental rights was filed on February 24, 1998. In it, DCF alleged as to the biological father that there is no ongoing parent-child relationship that ordinarily develops as a result of a parent having met on a continuing, day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment of the parent-child relationship would be detrimental to the best interests of the child. DCF alleged as to the biological mother that (1) the child has been denied by reason of an act or acts of commission or omission by the mother the care, guidance or control necessary for his physical, educational, moral or emotional well-being; and/or (2) the child has been found in a CT Page 5173 prior proceeding to have been neglected or uncared for and the mother has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time considering the age and needs of Nicholas H., that she could assume a responsible position in the life of the child.
The trial was held on March 22, 23, and 30, 1999. Twenty-one exhibits were submitted. Testimony was received from the DCF worker, a probation officer, Dr. David Gaccione, an orthopedic surgeon, Dr. John Leventhal, a pediatrician, a police officer, a court appointed psychologist, the mother, and her now mother-in-law.
The evidence in this case is applicable to both petitions, at least as of their respective filing dates for adjudication purposes. The following facts are found.
The mother of Nicholas left the father while she was still pregnant. They had not married. The father had been extremely assaultive of the mother, frequently beating her. She went to live in a battered women's shelter and stayed there until after Nicholas was born. Nicholas was born on February 24, 1997.
Abandonment focuses on the parent's conduct. In re MichaelM., 29 Conn. App. 112, 614 A.2d 832 (1992); In re Rayna M.,13 Conn. App. 23, 36, 534 A.2d 897 (1987); In re Kezia M.,33 Conn. App. 12, 632 A.2d 1122 (1993). The biological father has never had any relationship at all with the child. He has not supported the child. He has not sent letters, cards or gifts. After service with these proceedings he never initiated contact with the DCF or appeared at or communicated with the court. The court finds by clear and convincing evidence that the biological father, David T. has never had an ongoing parent-child relationship with Nicholas. He has suppressed his interest in establishing such a relationship. It would not be in Nicholas' best interest to allow time for his biological father to decide whether he is interested in such a relationship and then seek to establish it.
The mother was living with a man, Harris J., at the time of the matters which give rise to these proceedings. She had known him and dated him in high school until 1991. They had gone their separate ways, keeping in contact. They commenced to date again after Nicholas was born. At some point prior to October 5, 1997 they were all living together with Harris J.'s mother in eastern CT Page 5174 Connecticut. The mother worked a 4:00 p.m. to midnight shift. The babysitter who watched the child was a 15 year old girl who lived in a border community in Rhode Island. On October 5, Nicholas was picked up from the babysitter's house by Harris J. and then he picked up the mother from work at midnight. They then went to a convenience food spot, arriving home thereafter. They stayed up a short while. The mother went to take a shower. While she was in the shower, Harris J. was responsible for the care of the child who was awake. The mother heard something over the water in the shower. When she got out of the shower she asked Harris what happened. He told her Nicholas was fussing and tangled in his blankets. He proceeded to give Nicholas a bottle; then, the mother rocked him and put him to bed. This was at about 3:30-4:00 a.m. He woke up on October 6, 1997 at about 9:00 a.m. He was given his bottle on the floor which he drank, holding it in both hands. He took a nap from about 11:30 to 1:30 or 2:00 p.m. His mother dressed him in shortalls and a crew neck sweatshirt. She says he showed no pain or lack of use of either arm. While the child was unattended he was in a walker. His mother stated while she was in another room, Harris J. stated the child tipped over his walker and got stuck between an ottoman and a coffee table. He cried. The mother comforted him. He was put back in the walker.
Then Nicholas, his mother and Harris J. went to the babysitters home. The babysitter was there with her mother. Nicholas' mother told the babysitter that Nicholas had tipped over his walker and that he had been tangled in his blankets the previous night. The babysitter and her mother subsequently took the child to Westerly Hospital reporting the child was not using his left arm. At the hospital, x-rays were taken. It was determined that Nicholas had a new (within the last day) greenstick fracture of the proximal ulna. The ulna bone is in the forearm. A greenstick fracture is so described because it is a fracture of the bone on one side, not all of the way through, much like when a piece of green wood breaks. The fracture is caused by either blunt trauma or excessive force over a fulcrum behind the injured area. These conclusions were independently reached by Dr. Campagnari, the child's pediatrician, Dr. Gaccione, the attending orthopedic, and Dr. Leventhal, a consulting pediatrician who reviewed the records of the injury. There was no bruising noted, which both Dr. Gaccione and Dr. Leventhal stated was not inconsistent with such an injury to a baby of Nicholas' age. CT Page 5175
An x-ray skeletal survey was taken. The x-rays showed new bone growth of the tibia which was medically conclusive evidence of a healing tibia fracture. This fracture was estimated to be3-4 weeks old.
The mother and Harris J. were summoned to the hospital. They were interviewed by the Rhode Island counterpart to DCF and police officers from the town they resided in.
The mother denied knowledge of the cause of the broken forearm proximate ulna. She stated it might have occurred when Nicholas tipped his walker over or when Harris disentangled his arm from blankets the night before. She denied any observation of Nicholas having expressed discomfort by crying or fussing and denied he favored or failed to use the left arm in the last day.
Harris J. gave two different statements. At 2 a.m. on October 7, 1997 at the hospital, he stated that he observed Nicholas in bed around 2:30-3:00 a.m. with his arm "behind him and he was tangled up in the blanket." Harris J. states he unwrapped him and flipped him back over. He states that is what he told the mother when she asked if he was alright.
On October 8, 1997, at 3:45 p.m. at the police department, he gave a different statement. He stated that he "started to play roughly with Nicholas. I began with tickling him and then I started to hold his left arm and left leg and flip him over so he would land on his stomach and back. One time I did this, Nicholas screamed. I stopped when he started crying and Terrielynn got out of the shower and asked me what happened. I told her I didn't know and that I was going to the kitchen to get a bottle." In this statement he stated he may have broken Nicholas' arm then but not intentionally.
The mother arrived at the hospital late the evening of October 7, 1997 having been contacted at work. The mother related to the police that Nicholas' arm was tangled behind him in a blanket the night before. She said that she noticed his arm was a little sore when she picked him up. She did not see him tip his walker later in the day but was told this by Harris J. She told the police that she had told the babysitter that the arm was sore because he slept on it wrong. In court, the mother testified that she had noticed no soreness through the day and she had not mentioned any soreness to the babysitter. She had, she testified, informed the babysitter of the blanket tangle and walker tip CT Page 5176 over just because she informed her of everything to do with Nicholas. She instructed the babysitter to call her if Nicholas developed soreness through the evening. She denies the babysitter's assertion (contained in the subsequent arrest warrant affidavit) that she had instructed the babysitter not to seek medical care. She expressed, however, that she was angry that the babysitter had taken Nicholas a week ago for a skin condition. The court finds the mothers statements in court inconsistent with her statements on October, 1997. She is not credible. The court concludes that she is lying and hiding knowledge of the actual incident.
At the hospital, the mother was reported to be hostile to the Rhode Island DCYF investigator by the hospital social service representative. The Rhode Island DCYF invoked a 72 hour hold on Nicholas. The matter had also been referred to Connecticut DCF because of the family's residence in Connecticut. DCF applied for and received an Order of Temporary Custody on October 9, 1997 from the regional Connecticut Juvenile Court. At the court hearing date of October 16, 1997, the mother waived her right at hearing but reserved the right to a hearing at a future date. That Order remains in effect to this date.
On November 18, 1997, expectations were issued by the court to the mother. They were: keep all appointments set by or with DCF; keep your whereabouts known to DCF or your attorney; visit Nicholas as often as DCF permits; participate in counseling, family violence program; secure/maintain adequate housing and income; and do not engage in any substance abuse. The mother was offered weekly visits with Nicholas from October 17 to December 1, 1997 and twice weekly thereafter until September, 1998. The mother attended the vast majority of her offered visits. She missed some visits due to illness, funeral, work schedule or court dates.
In January, 1998, the mother partially participated in the family violence counseling but was discharged as noncompliant in August, 1998, having missed half of her appointments. The mother reported that she and Harris had attended on a three week cycle, of one appointment per week: individual counseling for her, for Harris, and then a joint counseling session the third week. The mother's position is that she stopped counseling because it costs her $50/week. There is no evidence before the court that she sought financial assistance from DCF for the counseling or was herself, in fact, unable to pay for her counseling. CT Page 5177
The mother reported to the DCF worker that she was engaged in counseling through her towns Youth Services and through the Employee Assistance Program at her place of employment. Neither was confirmed by the service providers.
December, 1997, Harris J. was arrested for assaulting Nicholas and breaking his arm. He has pled guilty to Assault in the Second Degree[1] and is awaiting sentencing. The mother was arrested in June, 1998 regarding the incident. She has pled guilty to Reckless Endangerment in the Second Degree[2]. She is awaiting sentencing as well.
The mother and Harris J. participated in a psychological evaluation, which included an interactive evaluation with Nicholas, on March 4, 1998. The psychological evaluation had been court ordered. The evaluator, Dr. Nancy Randall, administered numerous tests, as listed in her report and clinical interviews. She found the mother to be a highly guarded defensive person. Mr. J has similar characteristics. Both were affectionate with Nicholas who focused more on his mother. The mother and her husband reported no marital problems. The mother stated "that the current situation has only strengthened their relationship with each other." Neither parent saw a need for treatment services. It is Dr. Randall's view to a reasonable psychological certainty that the parents "are protective of each other and it is doubtful that either of them would acknowledge if the other person was, in fact, hurting the child."
The court finds, based upon his statement and guilty plea, that Harris J., the husband of the mother, assaulted Nicholas within the meaning of General Statutes § 53a-60, causing his broken arm. Based upon all of the evidence and her guilty plea to Reckless Endangerment in the Second Degree, the court finds that the mother recklessly engaged in conduct which created a risk of physical injury to Nicholas. The court finds that the mother failed to seek proper medical attention for Nicholas' arm, knowing that it was causing him great discomfort. The court finds that the mother knew Harris J. had done something to Nicholas creating the discomfort in Nicholas' arm. All the next day, until the babysitter's, Harris J. kept asking if the arm was alright. Mother knew the arm was not alright, that is why she told the babysitter about it. The injury to Nicolas' arm was a serious physical injury. It was an injury of a fractured bone to one of his arms. It was painful when incurred. Nicholas was CT Page 5178 only 7 months old when it was incurred. He was entirely dependent on his mother for his care and safety, unable to ambulate to safety or verbalize his needs for safety.
Nicholas' mother remains unwilling to accept that her husband is responsible for causing this injury. She testified that she and he were in therapy to address the issues surrounding Nicholas' removal and hoping to get him back. She told the court that from October, 1997 to the date of this trial, she never engaged in the inquiry as to whether Harris caused Nicholas' injury. She was present in criminal court when Harris pled guilty to Assault 2. She knew the State said he was the one who injured Nicholas, but she tells the court she personally doesn't know that, and when she was in court with him she wasn't really paying attention. She tells us she never asked him how the injury occurred. She has no intention of leaving Harris. She will await his return from prison. She was not concerned whether Harris was rough with Nicholas because she had never seen him be rough with Nicholas.
The mother has some notion, that is inferred from her attorneys closing argument, that this court should not seriously address the issues surrounding Nicholas' broken arm because the convictions and arrests were all triggered, in some way, by the fact that the babysitter, who set the train in motion by bringing Nicholas to the Westerly Hospital, was a minor victim of sexual assault by Harris J. No relationship between these separate criminal acts was established at trial.
DCF, however, it was determined, encouraged the investigation and arrest of the mother because it was believed that it would assist them in the pursuit of this petition. This conduct is offensive and outrageous. If there was not a child with a separate and independent interest in these proceedings, the court would deny the petition brought by DCF as a sanction for its offensive manipulation of the criminal justice system for its own perceived goals. It is bad public policy. Parents cannot be expected to trust DCF and their workers when their worker is unilaterally initiating contact with the police to encourage the police to further investigate the parent and the purpose of the call is not a concern over justice, but instead to gain some perceived advantage in juvenile court proceedings. Of course, DCF and its workers are expected to behave as any other good citizen reporting and responding to proper inquiry regarding criminal conduct. That is qualitatively different than where the CT Page 5179 motivation for the contact to police is to strategically improve the Department's position on a pending action, here the termination of parental rights.
The court finds by a fair preponderance of the evidence that Nicholas was denied proper medical care and attention by his mother. The court finds by a fair preponderance of the evidence that Nicholas was subjected to unsafe conditions by his mother by physical injuries inflicted on him while he was in his mother's care that were not caused by the reasons she gave the blanket tangle or walker tumble. The court adjudicates Nicholas a neglected child.
The court finds that Nicholas was the victim of a serious physical injury to his arm. The injury occurred while Nicholas was in the mother's care and she offered no explanation consistent with the injury. The force necessary to sustain the fracture to the forearm dictates that neither the blanket nor the walker incidents could have caused the injury. Neither blunt trauma nor a fulcrum with great force over it was present. The expert medical evidence found the reporting of a fall from the walker inconsistent with the injury for the same reasons. Further, Dr. Gaccione concludes that another type of bone break would have occurred from the end of the bone as the more likely result if a fall from the walker had caused it.
The mother also raised the possibility that Nicholas bones fractured (arm and leg) because he might have brittle bone disease. He was examined and he had none of the objective criteria for the disease. Further, his failure to suffer further broken bones ever since he was in foster care, at a tumbling toddler age, eliminates brittle bone disease as a cause of broken bones in the mother's care. While the mother did not cause the injury, she married and continues to stay married to, and remain committed to Harris J. who did cause the injury, by his own admission of guilt. She was inconsistent and untruthful about the matters essential to issues surrounding causation of the injury. The mother did not protect Nicholas by seeking medical care for the injury received. The mother does not acknowledge that Harris J. pled guilty to causing the injury or, in fact, that he did cause the injury. Her only plan for safeguarding Nicholas if she regained custody of him, is to change babysitters. The court finds from all of these circumstances and the others recited herein, that DCF has proven by clear and convincing evidence that by reason of these acts and omissions of the mother, Nicholas has CT Page 5180 been denied the necessary care and control for his physical well-being. In Re: Felicia D.35 Conn. App. 490, 501-2 (1994).
DCF also seeks the termination of parental rights on the alternate ground claiming that Nicholas has been found neglected and the mother has failed to rehabilitate within a reasonable time given the age and needs of Nicholas. In its petition, DCF does not claim that the conditions pertaining to Nicholas and his biological parents have existed for more than one year. Instead, it requests the one year requirement be waived as necessary under the totality of the circumstances surrounding the child to promote the best interest of the child. As of July 1, 1998, this statutory (one year) requirement is eliminated. This petition, however, was filed on February 24, 1998, just under five months after the incident which gave rise to the petition.
The mother's loyalty to her then boyfriend has not been tempered from the time of the incident to the trial. At some moments, she, all the while doubting that he caused the injury, says if he did it was absolutely accidental. In the face of his inconsistent explanations and plea of guilty to assault she continues to maintain that she does not suspect him the cause of Nicholas' injury. In the face of the medical discovery of a preexisting healing fracture as well as the injury to the forearm she has shown no insight into the dangers Nicholas has been exposed to in her home. The break of the leg was described by the orthopedist as a long bone break of the leg which is inconsistent with any normal or accidental movements of a pre-ambulatory child. The mother has not focused on this harm at all. She points out that the child appeared fine to the pediatrician when examined on August 26, 1997. The simple fact is that a noninjured child on August 26, 1997 is not inconsistent with a child with a healing leg fracture estimated to be 3-4 weeks old on October 7, 1997. After being told about this injury she never discussed it with Harris, she tells the court. The court finds the mother to be untruthful and callous and ignorant to the well-being of her son and the overriding urgent obligation upon her to provide him a safe home and to take all necessary steps to accomplish this responsibility. In all her testimony and statements at the hospital, the mother never expressed concern about the extent, nature or severity of Nicholas' injuries. The court finds, under all the circumstances, that in order to promote the best interests of Nicholas, the one year requirement should be waived.
In regard to the meeting of expectations, the mother only CT Page 5181 attended half of her counseling appointments and did not pursue any other counseling venues. She stopped going to the counseling she had participated in, because she saw no need for services or further counseling. She was only attending because she thought she had to for Nicholas to be returned to her. The mother told DCF that she was attending counseling through an employee assistance program at her place of employment, at a local hospital. Upon inquiry, the DCF worker found that she was not attending any such program.
Her failure to seek medical care for Nicholas' injury, her failure to inquire into the cause of the injury or consider Harris as possibly culpable renders her significantly deficient as a parent. Her behavior in these regards is consistent with Dr. Randall's evaluation of her. Mrs. J is a highly dependent woman. . . . "At this point, she appears to have latched on to her husband for strength, and is relying heavily upon him to help her through this. For this reason, she does not feel that she can afford to believe that he could be responsible for her son's injuries, as it would require that she consider her relationship with this man."
The language of our statutes makes it clear that in assessing a parent's rehabilitative prognosis, it must be viewed in the context of what is "within a reasonable time, considering the age and needs of the child". § 17a-112(b)(2). See also In re LuisC., 210 Conn. 157, 167, (1989); In re Davon M.,16 Conn. App. 693, 548 A.2d 1350 (1988). These problems are entrenched and have not improved with counseling. The mother has gained no benefits or insights from counseling. Until and unless she allows herself to realize that her home prior to removal was unsafe for Nicholas, and, that her husband has responsibility for the unsafe conditions, she cannot restore herself sufficiently to provide a safe home for Nicholas.[3] She has not shown any inclination to change anytime soon. Nicholas is now two years and two months old. He has not lived with his mother since he was just over seven months old. He has never lived with his father and been abandoned by him since birth. Almost 3/4 of his life has been spent in foster care to date. The court finds by clear and convincing evidence that Nicholas has been found neglected in the neglect portion of this coterminous proceeding, and the biological mother has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of Nicholas that she could assume a responsible position in Nicholas' life. CT Page 5182
The court finds that in the circumstances of Nicholas' life the conditions for the termination of his parents' rights have continued for an extended period of time. The one year period is artificial in the context of this case. The mother has shown an absolute unwillingness to examine or accept her responsibility for Nicholas' plight. This unwillingness of the mother to change, grow or rehabilitate herself in this area has shown no sign of abatement. The termination petition was brought one year after the child was born. In that one year, until removal the child had lived in a home with Harris J. and his mother. He had sustained a prior fracture. The mothers testimony makes clear that she feels that Harris, who assaulted her child, was an excellent caretaker of him. The conditions of failure to appreciate the need to properly protect her child have existed from when she exposed her child to Harris up and to the present day. Under the totality of the circumstances and considering the best interests of Nicholas as paramount, the court waives the one-year requirement of General Statutes § 17a-43. In re Saba P., 13 Conn. App. 605,609-610 (1988).
Required findings:
(1) The timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with the parent.
Due to the nature of the injury to Nicholas' arm, it was not possible for DCF to provide services with him in the home before seeking his removal. Since his removal, DCF has offered services and visitation to facilitate the reunion of Nicholas with his mother. It is the mother's failure to avail herself of all those services and to make appropriate inquiry and show sufficient concern about the nature and extent of safety problems for Nicholas in his home that has prevented reunion with her. As to the father, simply he has abandoned Nicholas and shown no interest in participating in his life. (2) Whether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended.
See above. The efforts also include the provision of services as described earlier in this decision.
(3) The terms of any applicable court order entered into and CT Page 5183 agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order.
The court ordered expectations of the mother were described above. DCF met its obligations to provide these services. The mother met some of the expectations as described above but not others, particularly in regard to counseling. She has shown no insight or growth in the understanding of her responsibility to, above everything else, including loyalty to her husband, safeguard the physical well-being of her son.
(4) The feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties.
The mother has never had physical care, custody or control of Nicholas for at least one year, nor, clearly has the father. When the child has visits with his mother he is comfortable with her and she is affectionate to him. The present foster parents have only had the child since September 25, 1998, less than one year. The attachment is described in this opinion under disposition.
(5) The age of the child.
Nicholas was born February 24, 1997. He is currently 2 years, 2 months old. As of the date of the filing of the petition he was 1 year old.
(6) The efforts the parent has made to adjust his circumstances, conduct, or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including, but not limited to:
(A) The extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions.
The mother was offered visitation twice per week until he was moved to his present foster home when it was reduced to once per week. She has attended the vast majority of her visitations. Of 91 scheduled visits, she attended 72 visits. The visitations she CT Page 5184 missed were mostly because of conflicting court dates, change in her work schedule or sickness. From April 30, 1998 to the end of September, 1998, the visits were at both DCF and the foster home to accommodate the mothers schedule. After the child was moved to his present home the visits were at a visitation center.
(B) The maintenance of regular contact or communication with the guardian or other custodian of the child. The mother often had communications with the foster mother of his placement at and to the time of the filing of the petition.
(7) The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent.
None.
Disposition
The mother has offered Nicholas' maternal great-grandmother who lives in Georgia as a resource for placement if the court does not return Nicholas to her care. DCF investigated her as a placement resource. While through the interstate compact, she was found acceptable for placement, DCF ultimately determined that was not in Nicholas' best interest. They were concerned that given her age of 71 years and Nicholas young age, there was a probability that she would not be able to continue his care until he was an adult, rendering him subject to at least one other placement sometime later in his childhood. The mother testified that she felt her grandmother was a good place for placement because it would keep Nicholas with a biological family member. It appears, also, that through her grandmother, the mother intends to have access to her child, by way of some sort of communication. Inasmuch as this court has determined by clear and convincing evidence that it is in Nicholas' best interests that his mother's parental rights be terminated, this court finds that it is not in his best interests for the biological mother to have continued access to him. This result cannot be sure to be accomplished if Nicholas were ultimately placed in the care of his great-grandmother. In correspondence entered as an exhibit, the great-grandmother has expressed her opposition to the termination of her granddaughter's parental rights in and to Nicholas. Further, this child's need for permanency would be CT Page 5185 exposed to serious interruption if his great-grandmother became unable to continue to care for him.
On September 25, 1998, Nicholas was placed in his present foster home. Nicholas presently refers to his foster mother as `Momma'. Nicholas is very attached to his foster parents. They would like to adopt Nicholas if he were available for adoption. Nicholas demonstrates great love for his foster parents, seeking affection from them and giving affection to them freely, spontaneously and often.
These findings are made after considering each child's sense of time, need for a secure and permanent environment, the relationship that each has with the respective foster parents, and the totality of all the circumstances. In re Juvenile Appeal(Anonymous), 177 Conn. 663, 667-68, 673 (1979). See also, J. Goldstein, A. Freud A. Solnit, Beyond the Best Interests of theChild 99 (1979).
Based upon the foregoing, the court finds by clear and convincing evidence that it is in the best interest of Nicholas to terminate the parental rights of his biological mother and biological father. It is ordered that the parental rights of the biological father. David T. in and to Nicholas H. are hereby terminated. It is ordered that the parental rights of the biological mother, Terrielynn H. in and to Nicholas H. are hereby terminated.
It is further ordered that the Commissioner of the Department of Children and Families is appointed the statutory parent for the purpose of securing an adoptive family for this child. The Commissioner shall give Nicholas H.'s present foster parents first preference for his adoption. The Commissioner shall file with this court no later than 90 days following the date of judgment a written report of efforts to effect such permanent placement and file further reports as are required by state and federal law.
MUNRO, J.